EXCESS UNDERWRITERS AT LLOYD'S, LONDON and Certain Companies Subscribing Severally but not Jointly to Policy No. 548/TA4011F01, Petitioners, ·

v.

FRANK'S CASING CREW & RENTAL TOOLS, INC., Respondent.

No. 02–0730.

Supreme Court of Texas.

Argued Feb. 15, 2006.

Decided Feb. 1, 2008.

S. Shawn Stephens, Baker & Hostetler, LLP, Fred A. Simpson, Jackson Walker, L.L.P., Houston, TX, G. Andrew Veazey, Huval Veazey Felder & Aertker, LLC, Lafayette, LA, Patrick J. Wielinski, Cokinos Bosien & Young, Arlington, Kent Hance, Hance Scarborough Wright Woodward & Weisbart LLP, E. Lee Parsley, E. Lee Parsley, P.C., Austin, Trevor Boyd Hall, Dallas, L. Hayes Fuller III, Naman Howell Smith & Lee LLP, Waco, James R. Old Jr., Germer & Gertz, L.L.P., Beaumont, E. Thomas Bishop, Bishop & Hummert, P.C., Dallas, Christopher Benjamin Dove, Locke Liddell & Sapp, LLP, Houston, David Taubenfeld, Haynes & Boone, LLP, Dallas, Fred C. Bosse, Austin, TX, for Amicus Curiae.

J. Clifton Hall III, Natalie Jerae Carlson, Karen Klaas Milhollin, Westmoreland Hall, P.C., J. James Cooper, Gardere Wynne Sewell & Riggs, Houston, TX, for Petitioners.

Tracy C. Temple, Warren W. Harris, Bracewell & Giuliani, L.L.P., William Fred Hagans, Carl D. Kulhanek Jr., Hagans Burdine Montgomery Rustay & Winchester, Christopher W. Martin, Martin Disiere Jefferson & Wisdom, Houston, TX, Greg Abbott, Austin, for Respondent.

Justice O'NEILL delivered the opinion of the Court, joined by Chief Justice JEFFERSON, Justice MEDINA, Justice JOHNSON, and Justice WILLETT.

On January 6, 2006, we granted respondent's motion for rehearing. We now withdraw our opinion issued May 27, 2005, and substitute the following.

■ In Texas, an insurer that settles a claim against its insured when coverage is disputed may seek reimbursement from the insured should coverage later be determined not to exist if the insurer "obtains the insured's clear and unequivocal consent to the settlement and the insurer's right to seek reimbursement." *Tex. Ass'n of Counties County Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 135 (Tex.2000). In this case, which involves excess coverage, the insured consented to the settlement but not to the excess insurer's asserted reimbursement right. We must decide whether to recognize an exception to the rule in *Matagorda County* and imply a reimbursement obligation when the policy involves excess coverage, the insurer has no duty to defend under the policy, and the insured acknowledges that the claimant's settlement offer is reasonable and demands that the insurer accept it. Because none of these distinctions alleviates the concerns that drove the Court's analysis in *Matagorda County*, we

decline to recognize such an exception. We further hold that the excess insurers failed to establish that Louisiana law regarding an insurer's right to reimbursement differs from Texas law. Accordingly, we affirm the court of appeals' judgment.

## I. Background

Frank's Casing Crew & Rental Tool, Inc. fabricated a drilling platform for ARCO/Vastar. When the platform collapsed, ARCO sued Frank's Casing and several others. Frank's Casing had a $1 million primary liability policy, and excess coverage up to $10 million with Excess Underwriters at Lloyd's, London, and Certain Companies Subscribing Severally But Not Jointly To Policy No. 548/TA4011F01 (collectively "excess underwriters"). The excess policy did not require the underwriters to assume control of the defense or the settlement of any claims, but did give them the right to associate with defense counsel retained by Frank's Casing or the primary insurer if it was reasonably likely that the excess coverage layer would be reached. After Frank's Casing notified the excess underwriters of ARCO's claims, the underwriters issued reservation-of-rights letters asserting that coverage for ARCO's claims was "limited or negated" under the policy's terms.

The primary carrier retained defense counsel for Frank's Casing. As trial approached, ARCO offered to settle its claims against Frank's Casing for $9.9 million, an amount within the excess policy limits. Frank's Casing rejected the offer without passing it on to the excess underwriters. Two weeks before trial, the excess underwriters contacted ARCO directly, without Frank's Casing's knowledge, and attempted to settle claims the underwriters were willing to concede were covered. No agreement was reached. ARCO later made an $8.8 million global settlement offer to all of the defendants, about $7.55 million of which was allocated to Frank's Casing. The excess underwriters offered to pay two-thirds of this amount if Frank's Casing and its primary carrier would pay the balance, and further agreed to waive all coverage defenses if Frank's Casing accepted that proposal. Alternatively, the excess underwriters offered to pay $5 million and defer all coverage issues to be resolved in arbitration. Frank's Casing rejected both proposals, insisting that it was covered under the excess policy and therefore the underwriters were obligated to fund the entire settlement.

Shortly before trial, the excess underwriters retained counsel to associate with Frank's Casing and its primary carrier in defending against ARCO's claims. As trial began, it quickly became clear that Frank's Casing was ARCO's primary target, prompting Frank's Casing's in-house counsel to contact ARCO and solicit a settlement demand within the excess coverage limits. Frank's Casing's counsel suggested that something in the $7 million range would be reasonable. ARCO responded with a $7.5 million demand. Frank's Casing forwarded ARCO's demand to the excess underwriters with a letter suggesting that the settlement offer was a reasonable one that the underwriters should accept. The letter reiterated Frank's Casing's disagreement with the underwriters' coverage position, and stated that Frank's Casing was looking to the underwriters to fund the settlement. In their response two days later, the underwriters agreed that the case should be settled, but noted that coverage issues remained. The underwriters offered to fund the entire settlement if Frank's Casing would agree to reserve those issues for resolution later. Frank's Casing rejected the underwriters' proposal, contending that the excess insurance policies obligated the underwriters to fund the settlement.

In response, the excess underwriters advised Frank's Casing that they would pay $7.5 million to settle the claim, less any contribution from the primary carrier, and then seek reimbursement from Frank's Casing. Within hours, the underwriters contacted ARCO and orally accepted its settlement offer, and the primary carrier tendered its remaining policy limits of approximately $500,000. A written settlement agreement among ARCO, Frank's Casing, and the excess underwriters preserved "any claims that exist presently" between Frank's Casing and the underwriters. Before that agreement was executed, the excess underwriters filed this suit.

Both Frank's Casing and the excess underwriters filed a series of cross motions for partial summary judgment. The trial court initially granted the underwriters' motions on their right to reimbursement. It also granted their motions for partial summary judgment on coverage, and another concluding that the excess underwriters were entitled to $7,013,612 in damages on their reimbursement claim. Before a final judgment was entered, this Court issued *Texas Association of Counties County Government Risk Management Pool v. Matagorda County*, declining to recognize an implied-in-fact, an implied-in-law, or an equitable reimbursement right outside of the insurance policy's provisions. 52 S.W.3d at 128. In light of our decision, the trial court ordered Frank's Casing to file a motion for new trial only on the reimbursement issue. Frank's Casing filed the motion and the trial court granted it, withdrew its prior order, and signed a take-nothing judgment in Frank's Casing's favor. The court of appeals affirmed. 93 S.W.3d 178. We granted the excess underwriters' petition for review to decide whether our decision in *Matagorda County* allows the underwriters to assert a reimbursement right under the circumstances presented.

## II. Reimbursement Under Texas Law

In *Matagorda County*, we examined an insurer's asserted reimbursement right in similar, though not identical, circumstances. 52 S.W.3d at 129. There, the Texas Association of Counties (TAC) provided law-enforcement liability coverage to Matagorda County, but the policy excluded coverage for claims "arising out of jail." When three inmates who had been assaulted by other prisoners in the County's jail sued the County, TAC initially denied coverage based on the jail exclusion. After some negotiation, TAC agreed to pay defense costs, subject to a reservation of rights to preserve its coverage contest, and filed suit against the County seeking a declaratory judgment that the inmates' claims were not covered. Ultimately, the plaintiffs in the underlying suit offered to settle for $300,000, an amount within TAC's policy limits. Although the County did not dispute the reasonableness of the proposed settlement, the County refused to fund or contribute to it, insisting that the claims were covered. At this point, TAC issued a second reservation-of-rights letter, again reserving its right to continue to deny coverage, but adding a statement that it was not waiving "any of its rights to pursue full recovery of this settlement amount from the County ... in the declaratory judgment action." *Id.* at 130. TAC settled the case, then amended its pending declaratory judgment action to seek reimbursement.

We held that, under the circumstances presented, TAC had not established a right to reimbursement. *Id.* at 133. First, we held that TAC could only reserve rights that were expressed in the policy, and TAC's policy did not contain a right of reimbursement. *Id.* at 131 (stating "a uni-

lateral reservation-of-rights letter cannot create rights not contained in the insurance policy"). Second, we held that neither the County's silence in response to TAC's reservation of rights, nor its failure to contest the settlement's reasonableness, were sufficient to create an implied-in-fact reimbursement obligation that did not appear in the policy. *Id.* at 132–33. Third, we held that TAC had not established a right to reimbursement under quasi-contractual theories of *quantum meruit* or unjust enrichment. *Id.* at 134–35. Finally, we held that an insurer could impose a reimbursement obligation on its insured by either drafting policies to specifically include a reimbursement right, or by obtaining the insured's "clear and unequivocal consent to the settlement and the insurer's right to seek reimbursement." *Id.* at 135.

Our analysis in *Matagorda County* highlighted the dilemma faced by both insurer and insured when a claimant presents a settlement demand within policy limits and coverage is uncertain. *Id.* (stating "[w]e recognize that, however the issue is resolved, either insurers or insureds will face a difficult choice when coverage is questioned"). On one hand, an insurer that rejects a reasonable offer within policy limits risks significant potential liability for bad-faith insurance practices if it does not ultimately prevail in its coverage contest. *Id.; see G.A. Stowers Furniture Co. v. Am. Indem. Co.,* 15 S.W.2d 544, 547 (Tex. Comm'n App.1929, holdings approved). Denying a reimbursement right in this situation in effect creates coverage in those cases where coverage is ultimately determined not to exist. At the same time, imposing an extra-contractual reimbursement obligation places the insured in a highly untenable position. *See Matagorda County,* 52 S.W.3d at 135. The insured is forced "to choose between rejecting a settlement within policy limits or accepting a possible financial obligation to pay an amount that may be beyond its means, at a time when the insured is most vulnerable." *Id.* at 134.

We resolved this quandary in *Matagorda County,* determining that the risk of coverage uncertainties was best placed with the insurer. *Id.* We reasoned that "[r]equiring the insurer, rather than the insured, to choose a course of action is appropriate because the insurer is in the business of analyzing and allocating risk and is in the best position to assess the viability of its coverage dispute." *Id.* at 135. An insurer in this situation has a number of options. If the insurer assesses its coverage position as strong, it may refuse to participate in settlement and rely on its coverage action, leaving the insured to negotiate a settlement with its own resources. Or, an insurer may seek prompt resolution of its coverage dispute, a course we have encouraged insurers in this position to take. *Id.* at 135 (citing *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 714 (Tex.1996); *Farmers Tex. County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 84 (Tex.1997)). Or, if an insurer's coverage position is difficult to assess, as is sometimes the case, the insurer can leverage the coverage dispute during settlement negotiations to lower the claimant's demand; by paying the negotiated claim, the insurer eliminates its own potential bad-faith liability, saves defense costs, and avoids protracted coverage litigation with its insured. Or, at the outset, the insurer may include a reimbursement right in the policy, which may yield a lower premium than a policy that does not contain such a right.

By contrast, recognizing an extra-contractual reimbursement right leaves insureds with fewer options and creates a number of potential problems. As we noted in *Matagorda County,* allowing an insurer to settle claims and then sue its policyholder "foster[s] conflict and distrust

in the relationship between an insurer and its insured," a situation that has been widely rejected in analogous contexts. *Id.* at 134; *see also Medina v. Herrera,* 927 S.W.2d 597, 604 (Tex.1996). For example, courts have long declined to allow insurers to seek equitable subrogation against their insureds. *See Phoenix Ins. Co. v. Erie & W. Transp. Co.,* 117 U.S. 312, 320–25, 6 S.Ct. 750, 29 L.Ed. 873 (1886). Strong public policy reasons support that rule:

> The fiduciary relationship between insurer and insured is fraught with conflicting interests.... [B]ecause of the fiduciary relationship, the insurer would be able to secure information from its insured under the guise of policy provisions available for later use in a subrogation action against the insured. [Further], the right to sue [its] own insured could be interpreted by an insurer as judicial sanction to breach the policy of insurance.

*Stafford Metal Works, Inc. v. Cook Paint & Varnish Co.,* 418 F.Supp. 56, 58–59 (N.D.Tex.1976) (citations omitted).

Several *amici* further warn that implying a reimbursement right would create a significant conflict for defense counsel during settlement discussions.[1] According to the *amici,* if an insured's acknowledgment of a settlement offer's reasonableness were to expose the insured to an extra-contractual reimbursement obligation, as the underwriters here contend it should, defense counsel's traditional role in evaluating and recommending settlement could end up advancing the insurer's interest over that of

the insured, necessitating the insured's retention of its own coverage counsel during what may be a critical point in the proceedings. Indeed, the *amici* argue, with defense counsel thus hindered from encouraging settlement, both the insured and the insurer will likely feel the need to hire their own "settlement counsel" to evaluate the case and formulate a strategy for the anticipated reimbursement litigation. Whether or not the concerns the *amici* voice are real or imagined, we believe they do portend significant distrust in the insurer/insured relationship during the settlement process should an equitable reimbursement right be implied.

Several *amici* also warn that recognizing a reimbursement right risks weakening the insurer's incentive to negotiate a settlement most favorable to its insured. Knowing that the insured will likely bear the ultimate payment obligation could incentivize the insurer to curtail attorney's fees and litigation expenses early in the proceedings by negotiating a quick settlement, with the added benefit of extinguishing any risk of *Stowers* liability. *See Stowers,* 15 S.W.2d at 547. The potentially protracted coverage/reimbursement litigation likely to follow would be at the insured's expense, even though the insured purchased insurance for the very purpose of hedging the risk and expense of future litigation.

The Court in *Matagorda County* weighed the varying risks that arise in this context and decided that insurers, on balance, are better positioned to handle them

---

1. We received *amicus curiae* briefs from United Policyholders; Pilco, Inc.; Shell Oil Co., Motiva Enterprises LLC, Burlington Resources Inc., Temple–Inland Inc., and Brad Fish, Inc.; the Texas Association of Defense Counsel; the Texas Civil Justice League; and Fred A. Simpson and Randall L. Smith, opposing a right to reimbursement under these circumstances. These *amici* argue generally that allowing reimbursement would distort the process of settling third-party liability claims and would allow insurers to extract contributions from their insureds that their policies do not support. The Complex Insurance Claims Litigation Association and the Property Casualty Insurers Association of America submitted briefs supporting the underwriters' right to reimbursement.

"either by drafting policies to specifically provide for reimbursement or by accounting for the possibility that they may occasionally pay uncovered claims in their rate structure." *Matagorda County,* 52 S.W.3d at 136. We decline to overrule that decision, and now turn to the underwriters' argument that the circumstances presented here are distinguishable and support their asserted right to reimbursement in this case.

## III. Excess Underwriters' Reimbursement Theories

The excess underwriters contend that by soliciting the settlement demand and agreeing to be bound by it, Frank's Casing impliedly consented to reimburse the excess underwriters. The underwriters further claim an equitable reimbursement right under the doctrines of *quantum meruit* and *assumpsit.* Although we declined to recognize an implied or equitable reimbursement right in *Matagorda County,* the underwriters contend our decision was limited to the facts presented in that case. They maintain that the rationale underlying our decision does not apply here because the excess underwriters had neither the duty to defend nor unilateral control over settlement, factors they contend were critical underpinnings of our *Matagorda County* analysis. The underwriters also emphasize that, unlike the insurer in *Matagorda County,* their policy prevented them from settling the case without Frank's Casing's consent.

### A. Implied–in–Fact Agreement

■ The excess underwriters argue that Frank's Casing impliedly agreed to reimbursement by taking an active role in procuring the settlement offer, and in demanding that the excess underwriters settle the claim. They also point to Frank's Casing's participation in the drafting and negotiation of the settlement agreement.

Undoubtedly, these actions demonstrate that Frank's Casing believed the claims should be settled, but they say nothing about Frank's Casing's agreement to a reimbursement obligation that does not appear in its policy. To the contrary, Frank's Casing's letters to the excess underwriters expressed continuing disagreement with the insurers' coverage position, indicated that Frank's Casing was looking to the excess underwriters to fund the entire settlement, and made clear that Frank's Casing would seek recourse against the underwriters if the case was not settled and a judgment in excess of policy limits resulted. In settling the ARCO suit, both Frank's Casing and the excess carriers expressly sought to preserve their positions in the coverage dispute; in effect, they agreed to disagree on the reimbursement question and let the trial court decide the legal effect. This is a far cry from impliedly consenting to reimbursement. The excess underwriters benefited from the settlement by eliminating potential *Stowers* liability in the event ARCO's claims were later determined to be covered, just as Frank's Casing benefited by eliminating the possibility of a large verdict that might turn out not to be covered. Given the parties' explicit efforts to preserve their positions, it makes no more sense to say that Frank's Casing impliedly agreed to reimburse the carriers than it would to say that the carriers impliedly agreed to waive their coverage position. Just as an insured's acceptance of a defense the insurer proffers with a reservation of rights implies the insured's consent to the reservation, the excess underwriters' agreement to accept the settlement in light of Frank's Casing's reimbursement contest implied the insurers' consent to Frank's Casing's reservation of the reimbursement question. As we reaffirmed in

*Matagorda County,* "a meeting of the minds is an essential element of an implied-in-fact contract." *Matagorda County,* 52 S.W.3d at 133 (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex. 1972)). Frank's Casing's agreement to reimburse the excess insurers cannot be implied in light of its consistent position that the insurers alone were responsible for the claims.

The excess insurers contend, however, that Frank's Casing's agreement may be implied here because, unlike in *Matagorda County,* Frank's Casing's policy did not allow the insurers to settle without Frank's Casing's consent. In support, the underwriters cite the following policy language:

> Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurers, shall have paid the amount of the underlying limits on account of such occurrence. *The Assured shall make a definite claim for any loss for which the Underwriters may be liable under this policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss* [2] *in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and Underwriters.* If any subsequent payments shall be made by the Assured on account of the same occurrence, additional claims shall be made similarly from time to time. Such losses

shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy.[3]

As we read this language, however, it describes when payment is due to the insured under the policy. Specifically, the insurer must pay Frank's Casing when the primary coverage layer is exhausted and Frank's Casing timely presents a claim for any excess amount for which it has been found liable as the result of a trial or a written agreement to which the parties acquiesced. In other words, the policy requires Frank's Casing to obtain the underwriters' consent to a settlement to receive payment under the policy. The policy language says nothing about the underwriters' reimbursement rights should they decide to negotiate a settlement of the claim.

## B. Equitable Theories

 The excess underwriters also claim a reimbursement right under the equitable theories of *quantum meruit* and *assumpsit.* Under the former theory, one who provides valuable services to another may establish that the service's recipient has an implied-in-law obligation to pay when the recipient has reasonable notice that the service provider expects to be paid. *See Heldenfels Bros., Inc. v. Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). Under the latter, a cause of action arises when money is paid for the use and benefit of another. *See King v. Tubb,* 551 S.W.2d 436, 442 (Tex.Civ.App.-Corpus Christi 1977, no writ).

---

**2.** The policy defines "ultimate net loss" as "the total sum which the Assured, or his Underlying Insurers as scheduled, or both, become obligated to pay ... either through adjudication or compromise...."

**3.** The title of this clause is not clear on any portion of the record; Frank's Casing refers to it as a "Loss Payable" clause, a characterization that the excess underwriters do not dispute.

We held in *Matagorda County* that TAC could not recover on either *quantum meruit* or an unjustment enrichment theory, a quasi-contractual doctrine that closely resembles *assumpsit*. The excess underwriters argue that *Matagorda County* does not govern because Frank's Casing sought a settlement demand from ARCO and demanded that the underwriters pay it. They also contend that their status as excess insurers with no duty to defend distinguishes this case from *Matagorda County*. Neither of those distinctions, however, allays the concerns underlying our analysis in *Matagorda County*.

The parties' respective positions were no less firmly drawn in *Matagorda County* than in this case. There, it was clear that "the County was looking to [TAC] to settle ... without a contribution from [the County]." *Matagorda*, 52 S.W.3d at 133 (internal quotations omitted). We fail to see how Frank's Casing's suggestion that ARCO submit a settlement demand within policy limits meaningfully distinguishes the decision. In *Matagorda County*, we concluded that "when coverage is disputed and the insurer is presented with a reasonable settlement demand within policy limits, the insurer may fund the settlement and seek reimbursement only if it obtains the insured's clear and unequivocal consent to the settlement *and* the insurer's right to seek reimbursement." *Id.* at 135 (emphasis added). We did so because "[o]therwise, the insured is forced to choose between rejecting a settlement within policy limits or accepting a possible financial obligation to pay an amount that may be beyond its means, at a time when the insured is most vulnerable." *Id.* That fundamental concern is unaffected by the fact that the excess underwriters had no duty to defend.

■ There is an additional reason that the excess underwriters are not entitled to a reimbursement right. That is, "[w]hen a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). Here, the insurance policies spell out the parties' respective obligations in great detail. As set out above, the excess underwriters were not liable under the policy until the primary coverage was exhausted, Frank's Casing had provided timely notice, and Frank's Casing had become liable for a judgment either as the result of a trial or a settlement to which the excess underwriters had agreed. To recognize an equitable right to reimbursement would require us to "rewrite the parties' contract [or] add to its language," *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex.2003), which we decline to do.

## C. Other States

The excess underwriters also urge us to overrule *Matagorda County* and follow the decisions of the California Supreme Court in *Blue Ridge Insurance Co. v. Jacobsen*, 25 Cal.4th 489, 106 Cal.Rptr.2d 535, 22 P.3d 313 (2001), and a Florida appellate court in *Colony Insurance Co. v. G & E Tires & Service, Inc.*, 777 So.2d 1034 (Fla. Dist.Ct.App.2000). In *Blue Ridge*, the California Supreme Court implied a reimbursement obligation in favor of a liability insurer that funded a settlement of claims ultimately determined not to be covered. *Blue Ridge*, 106 Cal.Rptr.2d 535, 22 P.3d at 314. The California court distinguished our decision in *Matagorda County* on the basis that California provides a much more limited opportunity to resolve coverage issues before the underlying lawsuit is resolved than does Texas. *Id.* 106 Cal. Rptr.2d 535, 22 P.3d at 322–23. Moreover, the legal background underlying *Blue*

*Ridge* differs significantly from Texas law. An insurer in Texas cannot be held liable under *Stowers* for failing to settle a claim that is not covered. *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994). Under California law, however, an insurer may not consider whether claims are covered in evaluating settlement demands. *Blue Ridge*, 106 Cal.Rptr.2d 535, 22 P.3d at 318.

In *Colony Insurance*, the Florida appeals court held that a liability insurer's reservation of rights letter, coupled with the insured's acceptance of a defense, entitled the insurer to reimbursement for defense costs it had paid. 777 So.2d at 1039. We held in *Matagorda County*, however, that a unilateral reservation-of-rights letter could not create a reimbursement obligation not contained in the insurance contract. *Matagorda County*, 52 S.W.3d at 131. As we have noted, to follow *Colony Insurance* would require us to overrule *Matagorda County*, which we decline to do.

## IV. The Dissents

Justice Hecht would impose an equitable reimbursement obligation on Frank's Casing that is not found in its policy, supplementing the terms these sophisticated parties negotiated based on an unjust-enrichment theory. Justice Wainwright, recognizing that the equities presented cut both ways, does not agree that a reimbursement right may be implied in law; instead, he would apply one in fact, as a matter of law, based on Frank's Casing's acquiescence in the settlement, even though both parties expressly reserved their respective positions on the coverage/reimbursement question. On indistinguishable facts, we rejected both of those theories in *Matagorda County*. 52 S.W.3d at 131–35. In "rewrit[ing] the parties' contract ... [because they] believe we should," *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 208 (Tex. 2004) (Hecht, J., dissenting), and eschewing our own precedent, the dissenting justices would, in the words of one *amicus curiae*, "take[ ] a step back from predictability in the law related to business transactions in Texas and, therefore, a step back from the continuing effort to attain a fair, efficient, and predictable civil justice system," Amicus Curiae Brief of Texas Civil Justice League in Support of Respondent's Motion for Rehearing, at 2.

In *Matagorda County*, this Court drew a bright-line rule disallowing reimbursement on an equitable unjust-enrichment theory because insurers are in a superior position to evaluate the risks stemming from a coverage dispute and can expressly allocate that risk by delineating reimbursement rights in their policies. 52 S.W.3d at 135–36. Justice Hecht's approach would undermine both the predictability that our decision in *Matagorda County* provided and the "strong public policy in favor of preserving the freedom of contract." *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 (Tex.2007). Just a few months ago, we concluded that an insured could not rely on the equitable "made-whole" doctrine to supplant a contractual subrogation clause. *Id.* at 645. We warned that courts "should not by judicial fiat insert non-existent language ... into parties' agreed-to contracts...." *Id.* at 649 n. 41. The Court proclaimed itself "loathe to judicially rewrite the parties' contract by engrafting extra-contractual standards," *id.* at 649, and reaffirmed the reasoning that supported our holding in *Matagorda County*: "insurers are well equipped to evaluate and reduce risk by, for example, 'drafting policies to specifically provide for reimbursement,'" *id.* (quoting *Matagorda County*, 52 S.W.3d at 136).

Justice Hecht attempts to limit our decision in *Matagorda County* to its facts, arguing the concerns that drove our decision there do not exist in this case and, even if they did, an equitable remedy could be fashioned to do equity in accordance with general restitution principles. While his dissent asserts that the remedy could be limited to avoid "unfairness," it offers little guidance as to the remedy's boundaries. He hints that the concerns underlying *Matagorda County* do not apply because Frank's Casing is "a substantial business." Under Justice Hecht's construct, then, whether an insured faces a reimbursement obligation would have to be decided on a case-by-case basis: insureds with less economic heft than Frank's Casing but more than Matagorda County might or might not be on the hook, depending upon how a court might view the "equities" presented. Justice Hecht's approach would breed uncertainty and "promote litigation rather than settle it." *Gandy*, 925 S.W.2d at 709.

Justice Wainwright's approach is similarly untenable. Agreeing with the Court that the circumstances would not support a reimbursement right implied in law, he would imply one in fact—as a matter of law. As in *Matagorda County*, however, the record here affirmatively demonstrates just the opposite. Frank's Casing's repeated insistence on its coverage position and on the excess underwriters' obligation to fund any settlement, and its express reservation of the question, belie any meeting of the minds—"an essential element of an implied-in-fact contract." *Matagorda County*, 52 S.W.3d at 133. Just as in *Matagorda County*, Frank's Casing "consistently contested [the excess underwriters'] coverage position and insisted that [they] pay under the policy." *Id.* Undoubtedly, the parties agreed that the case should be settled. But the excess underwriters' own letter to Frank's Casing advising that it would contact ARCO and attempt to settle noted that the underwriters had "asked Frank's to contribute to the settlement [and] Frank's ha[d] refused." Furthermore, though Justice Wainwright contends that Frank's Casing's agreement to the settlement constituted a manifestation of assent to the terms on which it was offered, there is uncontested evidence that the excess underwriters first mentioned reimbursement in a letter it sent to Frank's Casing just hours before they contacted the plaintiffs and settled the case. Frank's Casing's assent cannot be inferred under these circumstances. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69(1)(a) (1981) (noting that assent may only be inferred "[w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them"). We held on nearly identical facts in *Matagorda County* that "there was no meeting of the minds" between the insurer and its insureds. *Id.* Given the parties' explicit efforts to preserve their respective positions on the coverage/reimbursement question, it makes no more sense to conclude that Frank's Casing impliedly agreed to reimburse the excess carriers than it would to say that the excess carriers impliedly agreed to waive their coverage position.

## V. Choice of Law

The excess underwriters argue alternatively that Louisiana law recognizes a reimbursement right, and that state's law should apply to this case because Frank's Casing's principal place of business is in Louisiana, the policy was issued through a Louisiana insurance agency, and the underlying incident arose from work Frank's Casing performed in Louisiana. Frank's Casing contends that the excess underwriters never requested that the trial court apply Louisiana law to the reim-

bursement issue, and also never established that it differs from Texas law. We agree with Frank's Casing.

■ The excess underwriters never requested that the trial court apply Louisiana law to the reimbursement issue or clearly asserted that Louisiana law applies. Instead, a footnote in their motion for summary judgment simply alluded to Louisiana law "[t]o the extent [it] might apply to this case," and then cited two Louisiana statutes, Louisiana Civil Code articles 2055 and 2298, and two cases, *Edmonston v. A–Second Mortgage Co.,* 289 So.2d 116 (La. 1974), and *E.F. Minyard v. Curtis Products, Inc.,* 251 La. 624, 205 So.2d 422 (1967), generally allowing recovery for unjust enrichment. Neither the statutes nor the cases cited specifically addressed an insurer's right to reimbursement from its insured when it settles a claim that is ultimately determined not to be covered, absent an express agreement.[4] In addition, after this Court issued its decision in *Matagorda County,* the excess underwriters again briefly cited general Louisiana unjust-enrichment law in their response to Frank's Casing's motion for reconsideration of the trial court's partial summary

judgment on reimbursement. After arguing at length that *Matagorda County* did not govern reimbursement in this case, they added a final three-paragraph section entitled "Louisiana Law Governs Excess Underwriters' Right to Reimbursement." They still did not ask the trial court to apply Louisiana law, however, but instead merely argued that Louisiana law would allow reimbursement "[t]o the extent this Court finds Louisiana law controlling." Even if the excess underwriters had clearly requested the court to apply Louisiana law, we cannot tell from the authorities they have cited how a Louisiana court would resolve the issue before us. As the party advocating the application of Louisiana law, the excess underwriters bore the burden of establishing that it differed from Texas law to overcome the presumption that it is the same as Texas's. *See Gevinson v. Manhattan Constr. Co. of Ok.,* 449 S.W.2d 458, 465 n. 2 (Tex.1969); *see also Unocal Corp. v. Dickinson Res. Inc.,* 889 S.W.2d 604, 607 n. 2 (Tex.App.-Houston [14th Dist.] 1994), *writ denied per curiam,* 907 S.W.2d 453 (Tex.1995).[5] Because they have not, we presume that the outcome would be no different under the foreign state's law.

4. In *Edmonston,* for example, the court held that a widow who had unwittingly conveyed a home worth more than $24,000 to a mortgage company to satisfy a $5,178.24 second mortgage could recover under Louisiana's unjust-enrichment statutes. 289 So.2d at 122. In *Minyard,* the court considered when limitations had run on a subcontractor's claim to recover from a product supplier amounts it had paid to compensate the contractor for defective caulking. 205 So.2d at 638. The court merely equated the subcontractor's claim seeking indemnity with an unjust-enrichment claim in determining the appropriate limitations period. *Id.* at 650, 653. In response to Frank's Casing's motion for reconsideration of the trial court's partial summary judgment on reimbursement, the excess underwriters cited a suit in which a court held that an insurer was not liable for statutory bad-faith penalties because the insurer had

sought reimbursement of settlement costs. *Peavey Co. v. M/V ANPA,* 971 F.2d 1168 (5th Cir.1992). In reversing the penalties, the Fifth Circuit noted that the insured had stipulated that it would be liable to reimburse the insurer if coverage was resolved in the insurer's favor. *Id.* at 1177.

5. The excess underwriters contend that the presumption that another state's law is the same as this state's does not apply because Louisiana law is not based on the common law, citing 29 AM. JUR.2d *Evidence* § 259 (2002). Neither we nor any other Texas court has recognized this distinction. In fact, we recently indicated that the presumption would normally apply in a case involving Louisiana law. *Coca–Cola Co. v. Harmar Bottling Co.,* 218 S.W.3d 671, 685 (Tex.2006).

## VI. Conclusion

We hold that the excess underwriters have not established a right to reimbursement under Texas law, nor have they established that the application of Louisiana law would produce a different result. Accordingly, we affirm the court of appeals' judgment.

Justice HECHT delivered a dissenting opinion, joined by Justice GREEN.

Justice WAINWRIGHT delivered a dissenting opinion.

Justice BRISTER did not participate in the decision.

Justice HECHT, joined by Justice GREEN, dissenting.

By refusing to apply to insurers the same law of unjust enrichment that applies to everyone else, the Court hands Frank's Casing Crew & Rental Tools, Inc. $7 million for which it paid nothing and to which it has no contractual right. The court does not deny the injustice of this result but argues that such windfalls are necessary to avoid situations in which an insured might be prejudiced by having to pay its own liabilities. Never mind that Frank's Casing claims no such prejudice in this case, or that no case can be found in which any insured ever claimed such prejudice, or that if any imagined prejudice ever actually did occur, it could easily be remedied. The Court's holding is contrary to the only other cases it can find on the subject,[1] and it has been expressly rejected in the *Restatement (Third) of Restitution and Unjust Enrichment*.[2] Worst of all, the burden of the windfalls in this and many other cases will most likely fall on other policyholders who have never tried to get away with demanding more coverage than they bought, so that insureds who stick to their policies will have the privilege of paying extra to satisfy the claims of those who do not.

A blanket rule providing an insurer reimbursement for payment of non-covered claims might work unfairness. An insurer could try to take unfair advantage of its insured's inexperience in assessing coverage issues and use a weak coverage dispute, coupled with the threat of a reimbursement claim if coverage is found lacking, to force the insured to contribute more toward the settlement of a liability claim than it should, thereby denying the insured the full protection of insurance to which it was entitled. But the Court's rule denying reimbursement in every situation is more than *potentially* unfair. As this case demonstrates, it actually allows an insured to take unfair advantage of the extra-contractual liability an insurer faces for failing to resolve claims against the insured and leverage the threat of that liability to force its insurer to settle a claim and abandon a serious coverage issue, thereby effectively obtaining coverage it did not pay for and increasing the risk for which other policyholders must pay. The general law of restitution avoids the problems of both extremes by allowing reimbursement to prevent unjust

1. *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489, 106 Cal.Rptr.2d 535, 22 P.3d 313, 318–319 (2001); *Colony Ins. Co. v. G & E Tires & Serv., Inc.*, 777 So.2d 1034, 1038–1039 (Fla. Dist.Ct.App.2000).

2. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35 & reporter's note to cmt. c, illus. 10 (Tentative Draft No. 3, 2004) ("it is the dissenting opinion in *Texas Ass'n of Counties [County Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 136 (Tex.2000) (Owen, J., joined by Hecht, J., dissenting)] that reflects the position of this Restatement").

enrichment but not otherwise.[3] This is reflected in section 35 of the *Restatement (Third) of Restitution and Unjust Enrichment*, recently adopted by the American Law Institute.[4] Section 35 provides a balanced, practical, and principled rule for resolving the issue presented by this case.

The Court encourages insurers, as it has in the past, to obtain prompt resolution of coverage disputes, but today's decision leaves them no alternative. Now an insurer *must* litigate coverage before a liability claim is resolved, even if that means putting an insured in the undesirable position of having to fight liability and coverage at the same time, even if it means litigating the liability claim in a declaratory judgment action to determine coverage, and even if it means delaying resolution of the liability claim until coverage has been determined. Otherwise, an insurer will be denied the right to litigate coverage altogether, which the Court surely cannot intend. I suspect that this consequence of the today's decision, forcing more coverage litigation, will cause far more problems than the hypothetical concerns expressed in the Court's opinion.

For these reasons, which I now explain more fully, I respectfully dissent.

# I

Respondent Frank's Casing Crew & Rental Tools, Inc. has provided oil well and completion services and products throughout the United States since 1938. Headquartered in Louisiana, it has offices in Texas and transacts business here.

In 1995, an offshore drilling platform that Frank's Casing had fabricated in Lou-

isiana for ARCO Oil and Gas Co. and its successor, Vastar Resources, Inc., collapsed and sank in the Gulf of Mexico. In May 1996, ARCO filed suit in Texas against two defendants, and after they in turn sued Frank's Casing as a third-party defendant, ARCO and Vastar (who had joined the suit as plaintiff, collectively "ARCO") named Frank's Casing as a defendant in January 1997. Alleging that Frank's Casing had failed to weld the platform components properly, ARCO sued for breach of contract, negligence, strict products liability, and contractual indemnity, seeking damages for lost profits and production and for costs of investigation, salvage, and repair, as well as exemplary damages and attorney fees.

In addition to a $1 million surplus lines comprehensive general liability insurance policy, Frank's Casing had a $10 million umbrella policy provided by petitioners, Certain Companies Subscribing Severally But Not Jointly To Policy No. 548/TA4011F01 and Excess Underwriters at Lloyd's, London ("the Excess Underwriters"). Frank's Casing notified both insurers of ARCO's suit. The primary insurer assumed the defense of the lawsuit, as was its right and duty under its policy, and hired counsel to represent Frank's Casing.

In March 1997, counsel for the Excess Underwriters wrote Frank's Casing a reservation-of-rights letter, stating in part:

Underwriters have commenced an investigation into the claims being made against Frank's in the [ARCO] Litigation. We are writing to advise you of our representation of Underwriters, to

**3.** Mark P. Gergen, *Restitution as a Bridge over Troubled Contractual Waters,* 71 FORDHAM L. REV. 709, 725–728 (2002).

**4.** RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35 & reporter's note to cmt. a (Tentative Draft No. 3, 2004). Tentative Draft

No. 3 was approved by the membership of the American Law Institute during its annual meeting on May 18, 2004. AMERICAN LAW INSTITUTE, PROCEEDINGS AT 81ST ANNUAL MEETING 259–260 (2004).

advise that we will be evaluating the coverage provided by the Umbrella Policy, to request your assistance and cooperation in our investigation into the claims being made against Frank's and the facts relevant to the Litigation, to advise that Underwriters have not yet come to any conclusions as to coverage, to invite Frank's to provide Underwriters any information that you believe might assist Underwriters in their evaluation of the coverage questions, to solicit your input into our evaluation, and to advise Frank's as to Underwriters' preliminary reservation of certain rights under the Umbrella Policy.

Specifically, the letter explained that coverage of ARCO's claims "may be limited or negated" under the umbrella policy because:

- claims alleging breach of contract and warranties "may not constitute an 'occurrence' as that term is defined by the policy"—"an accident or a happening ... which unexpectedly and unintentionally results in personal injury or property damage or advertising liability";

- the policy excluded property damage claims for the failure of Frank's Casing's product or work due to deficiencies in its designs, plans, or written instructions;

- the policy also excluded the costs of removal, recovery, repair, or replacement of product or work that failed to perform its function, and the costs of raising, removal, or destruction of any

of wreckage or debris or obstruction, however caused;

- the policy expressly excluded coverage for punitive damages and would not cover any damages occurring after September 30, 1995, the end of the policy period; and

- notice of the claim may not have been timely.

The letter also stated that the scope of the umbrella policy's coverage was to follow the form of the primary policy (other than the monetary limits, of course), which counsel had not had an opportunity to review, and that the primary policy might therefore further restrict coverage of ARCO's claims. In January 1998, the Excess Underwriters sent Frank's Casing a second reservation-of-rights letter giving an additional reason for lack of coverage: that ARCO's claims for lost profits and loss of use of the platform were not "property damage" covered by the policy. The record does not reflect whether Frank's Casing responded to the letters but does indicate that Frank's Casing took the position that all claims were covered.

Nearing the February 16, 1998 trial setting, the parties discussed settlement. ARCO's claims totaled $16 million (Frank's Casing stipulated that property damage was $5,630,360.28), far more than the policy limits of Frank's Casing's insurance, but after an unsuccessful mediation, ARCO's counsel offered to settle for $9.9 million. Although Frank's Casing had no express right under its primary policy to control settlement,[5] and may or may not have had one under the umbrella policy,[6]

---

5. The policy provided that the insurer "shall have the right and duty to defend any suit against the Assured ... and may make such investigation and settlement of any claim or suit as it deems expedient".

6. The policy provided: "The Assured shall make a definite claim for any loss for which

the Underwriters may be liable under this policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or *by written agreement of the*

its corporate counsel unilaterally rejected the offer as too high, even though it was within policy limits, and did not even forward it to the Excess Underwriters. On January 30, counsel for the Excess Underwriters contacted ARCO directly, without Frank's Casing's knowledge, and attempted to settle only the claims they believed were covered, but no agreement was reached. When Frank's Casing's counsel learned of this, he objected to any settlement negotiations being conducted without his involvement. ARCO then offered to settle all of its claims against all of the defendants for $8.8 million. In a February 2 letter to corporate counsel for Frank's Casing, counsel for the Excess Underwriters estimated that, after contributions offered by other defendants, Frank's Casing would be required to contribute about $7.55 million. Assuming that $750,000 of primary coverage remained, the letter made two proposals: the Excess Underwriters would pay two-thirds of the amount required to meet ARCO's demand and waive all coverage issues if Frank's Casing would pay one-third; alternatively, they would contribute $5 million to any reasonable settlement Frank's Casing reached with ARCO and arbitrate coverage issues later. Frank's Casing refused both proposals.

Under their policy, the Excess Underwriters had no duty to provide Frank's Casing a defense but did have the right to associate in the defense with Frank's Casing's cooperation when it appeared likely they would be involved,[7] and on February 2, they retained separate trial counsel. Trial commenced February 17, and it immediately became clear for the first time that Frank's Casing was ARCO's target defendant. The next day, Frank's Casing's corporate counsel requested ARCO's trial counsel to make a settlement offer within the umbrella policy's limits, suggesting $7 million. ARCO promptly responded with a $7.5 million offer, which Frank's Casing's counsel immediately passed along to the Excess Underwriters in a letter hand-delivered and faxed to their counsel, insisting that since trial was not going well, "Frank's does now look to Underwriters to settle this claim." The letter added that the Excess Underwriters' coverage reservations had "little credence" and that it was "probable" Frank's Casing would suffer a jury verdict in excess of policy limits. ARCO's last offer, the letter continued, was "one that an insurer, acting as a reasonably prudent insured, would accept." Counsel concluded:

Should Underwriters in this instance refuse to move forward and resolve this dispute based upon [ARCO's] current demand, [Frank's Casing] specifically reserves its rights pursuant to the *Stowers* doctrine [ [8]] to proceed against the

---

Assured, the claimant, and Underwriters." (Emphasis added.) The Excess Underwriters argue that the last phrase gives Frank's Casing the right to consent to any settlement, but Frank's Casing argues that this stretches the phrase's meaning.

7. The policy provided:
 The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers or both in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding.

8. *See American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 843 n. 2 (Tex.1994) ("The duty of an insurer to exercise ordinary care in the settlement of claims to protect its insureds against judgments in excess of policy limits is generically referred to in Texas as the

Underwriters for any liability Frank's may incur over and above the limits of its insurance.

On February 20, counsel for the Excess Underwriters responded by faxed letter that ARCO's offer should be accepted but stated that they continued to believe "a substantial portion" of the claims were not covered and that it would be "unreasonable for Umbrella Underwriters to assume total responsibility for [ARCO's] current demand." The Excess Underwriters again proposed to resolve both ARCO's claims and the coverage issues by paying two-thirds of ARCO's settlement demand with Frank's Casing paying one-third (after contribution of the remainder of the primary policy's limits, which turned out to be about $500,000). Alternatively, the Excess Underwriters proposed to pay ARCO's demand, less the contribution from the primary insurer, with Frank's Casing's agreement to resolve coverage issues later. When counsel for Frank's Casing faxed a reply again refusing to contribute to the settlement and reiterating its demand that the Excess Underwriters accept ARCO's offer, the Excess Underwriters acceded. ARCO had indicated that its offer would remain open only until the trial court's ruling on a particular issue, which was expected imminently. By letter faxed to Frank's Casing's counsel on the morning of February 23, counsel for the Excess Underwriters stated that they were acting "to ensure that the favorable settlement will not be lost to both Frank's and Umbrella Underwriters." But, he added, the Excess Underwriters would "continue to reserve all coverage issues" and would "hold Frank's responsible for and ... seek reimbursement of all sums

paid in settlement of claims for which no coverage exists".

A few hours later, counsel for the Excess Underwriters' faxed ARCO's trial counsel a letter agreeing to pay $7.5 million in settlement. Frank's Casing contends that it had no opportunity to respond to the Excess Underwriters' reimbursement claim before the case settled. But when the settlement was announced to the court the next day, counsel for Frank's Casing and the Excess Underwriters both referred to the latter's reimbursement claim:

[Counsel for Frank's Casing]: Underwriters have attempted to reserve all rights against Frank's as to coverage under the umbrella policy. It is Frank's position that no proper preservation of reservations has been made and Frank's denies that the Underwriters may preserve coverages. More specifically, Underwriters' offer to resolve the issue with [ARCO], which [was] made pursuant to Frank's demand by a *Stowers* letter dated February 19, 1998 and February 20th, 1998, forwarded by Michael Andrepont to Jay James Cooper, counsel for Underwriters.

Underwriters have accepted this offer in order to avoid the possibility of having to pay out funds in excess of policy limits. As a result, it is Frank's position that Underwriters have either waived their right to reserve cover issues or alternatively or stop [sic] from asserting any coverage issues since Underwriters have agreed to the settlement.

\* \* \*

[Counsel for the Excess Underwriters]: This settlement is being funded by Frank's Umbrella Underwriters subject

---

*Stowers* duty."); *Stowers Furniture Co. v. Am. Indem. Co.,* 15 S.W.2d 544 (Tex. Comm'n App.1929, holding approved).

to a full reservation of all rights against Frank's under the umbrella policy No. 548TA4011FO1. And these Underwriters will hold Frank's responsible for and will seek reimbursement of all sums paid the settlement of claims for which no coverage exists under the umbrella policy.

The parties later signed and filed a settlement agreement that made no reference to the Excess Underwriters' reimbursement claim specifically but preserved "any claims that exist presently or may arise in the future between Defendant Frank's and Frank's Insurers arising from the claims asserted by Plaintiffs."

Also on February 23, the Excess Underwriters filed this action against Frank's Casing to resolve the coverage dispute and to obtain reimbursement for the settlement of any non-covered claims. They asserted seven provisions of the umbrella policy that limited or denied coverage of ARCO's claims. The policy neither provided for nor prohibited a right of reimbursement; it was entirely silent on the subject. The Excess Underwriters asserted that the right was implied in law and in fact. In its answer, Frank's Casing asserted in part that the Excess Underwriters had not stated a claim in contract or tort and had acted with unclean hands. Frank's Casing also counterclaimed for negligence, bad faith, violations of the Texas Insurance Code, breach of contract, business disparagement, and a declaratory judgment that all of ARCO's claims were covered by the umbrella policy.

The case was presented to the trial court in seven motions for partial summary judgment, five by the Excess Underwriters and two by Frank's Casing,

addressing separately the reimbursement issue, the various coverage issues, and damages. In September 1999, the trial court issued a series of orders granting the Excess Underwriters reimbursement for any non-covered claims and denying most of Frank's Casing's counterclaims. Then in March and April 2000, the trial court granted the Excess Underwriters' motions on the coverage issues and denied Frank's Casing's remaining motion. Finally, on December 14, 2000, more than two years and nine months after the case was filed, the trial court granted the Excess Underwriters' motion on damages, ordering that they were entitled to reimbursement of $7,013,612. But a week later, this Court issued its decision in *Texas Association of Counties County Government Risk Management Pool v. Matagorda County,* holding that an insurer that pays a claim later determined not to be covered by the policy is entitled to reimbursement "only if it obtains the insured's clear and unequivocal consent to the settlement and the insurer's right to seek reimbursement." [9] The trial court directed Frank's Casing to move for reconsideration on the issue of the right to reimbursement, and Frank's Casing complied. After further hearing, the trial court granted the motion, withdrew its orders on that issue, granted summary judgment for Frank's Casing on that issue, and signed a judgment that the Excess Underwriters take nothing. The trial court did not withdraw its orders resolving the coverage issue in favor of the Excess Underwriters.

Only the Excess Underwriters appealed. The court of appeals affirmed, although it noted:

**9.** 52 S.W.3d 128, 135 (Tex.2000) ("[W]e hold that, when coverage is disputed and the insurer is presented with a reasonable settlement demand within policy limits, the insurer may fund the settlement and seek reimbursement only if it obtains the insured's clear and unequivocal consent to the settlement and the insurer's right to seek reimbursement.").

We recognize this case carries *Matagorda County* to a logical conclusion that is somewhat disquieting—Frank's was able to resolve the parties' coverage dispute in its own favor simply by sending a *Stowers* demand to the Underwriters. Thereafter, the Underwriters had to pay if Arco's claims were *within* the policy, but also had to pay *if they [were] not* within the policy because there was no right to reimbursement. But this is a matter that the Underwriters must take up with the superior court.[10]

The Court granted the Excess Underwriters petition for review[11] and issued an opinion reversing and remanding the case to the trial court for rendition of judgment in their favor.[12] Though two JUSTICES did not join fully in the Court's opinion,[13] none dissented from the judgment.[14] When respondent's motion for rehearing was filed, only four of the JUSTICES present at oral argument remained on the Court. To fully consider respondent's motion, petitioner's response, and a number of amicus briefs,[15] the Court granted the motion and ordered the case reargued.[16]

## II

Frank's Casing has not challenged, either in the court of appeals or in this Court, the trial court's rulings on the coverage issues. Therefore, I assume that none of ARCO's claims were covered by the umbrella policy. The only issue, then, is whether the Excess Underwriters are entitled to be reimbursed for the amount they paid in settlement.

The parties agree that the coverage issues were governed by Louisiana law, but they disagree whether the reimbursement issue is governed by Louisiana law or Texas law, and whether the two are different. Frank's Casing contends that the Excess Underwriters never requested the application of Louisiana law in the trial court and that in any event, on the issue before us it is no different than Texas law. The Excess Underwriters alluded to Louisiana law twice in the trial court. A six-sentence footnote in their motion for summary judgment began, "[t] o the extent Louisiana law might apply to this case", and then cited two Louisiana statutes[17] and two cases[18] generally allowing recovery for un-

10. 93 S.W.3d 178, 180 (Tex.App.-Houston [14th Dist.] 2002).

11. 46 Tex. Sup.Ct. J. 546 (Apr. 3, 2003).

12. 48 Tex. Sup.Ct. J. 735, 2005 WL 1252321 (May 27, 2005).

13. *Id.* at 744, 2005 WL 1252321 (O'Neill, J., concurring); *id.* at 746, 2005 WL 1252321 (Wainwright, J., concurring).

14. JUSTICE BRISTER did not participate in the decision, having authored the opinion for the court of appeals while serving as Chief Justice of that court. JUSTICE JOHNSON also did not participate, having recently been appointed to the Court.

15. Amicus briefs in support of respondent's motion for rehearing have been submitted by United Policyholders; Brad Fish, Inc.; Pilco, Inc.; Shell Oil Co.; Motiva Enterprises LLC;

Burlington Resources Inc.; Temple–Inland Inc.; Texas Civil Justice League; Texas Ass'n of Defense Counsel, Inc.; and Valero Energy Corp. Amicus briefs opposing the motion have been filed by Property Casualty Insurers Ass'n of America; American Insurance Ass'n; and Complex Insurance Claims Litigation Ass'n, on behalf of its members: AIG; Chubb & Son; Farmers Insurance Group; The Hartford Insurance Group; Liberty Mutual Group Inc.; St. Paul Fire and Marine Insurance Co.; Selective Insurance Co. of America; The Travelers Indemnity Co. and Travelers Indemnity and Surety Co.; and Zurich American Insurance Co.

16. 49 Tex. Sup.Ct. J. 240 (Jan. 6, 2006).

17. LA. CIV. CODE ANN. arts.2055, 2298.

18. *Edmonston v. A–Second Mortgage Co. of Slidell,* 289 So.2d 116 (La.1974); *E.F. Min-*

just enrichment. None of the authorities cited specifically addressed the issue in this case. In response to Frank's Casing's motion for reconsideration, after this Court's decision in *Matagorda County* issued, the Excess Underwriters again briefly cited general Louisiana authority "[t]o the extent this Court finds Louisiana law controlling". Neither instance amounted to an actual assertion that the reimbursement issue is controlled by Louisiana law. If Louisiana law were controlling, it is not clear from the authorities cited how it would resolve the issue before us. Without proof that Louisiana and Texas law are different, they should be presumed to be the same,[19] and which of the two states' law controls need not be resolved.

Accordingly, I turn to the question whether Texas law affords an insurer the right to reimbursement from its insured for settling a non-covered liability claim.

### III

When the parties to a contract disagree over what performance is required and that disagreement cannot be resolved before performance is due, the party who must perform is put to the choice of doing more than he thinks is called for or facing the other party's claim of breach. The potential adverse consequences of the latter course may be severe enough that the party is all but forced to render the performance demanded and forego resolution of the dispute. The other party thus obtains more than he bargained for.

According to the *Restatement (Third) of Restitution and Unjust Enrichment:*

The commonsense solution to this dilemma—allowing performance with reservation of rights—promotes justice and efficiency. Because it offers recourse to a party who might otherwise be effectively compelled to render an extracontractual performance, it serves both to reinforce the parties' agreement and to prevent the unjust enrichment that would otherwise result. Equally important, the mechanism of contingent or provisional performance (that is, performance subject to an eventual claim in restitution) will serve in many cases to reduce the overall cost of resolving the parties' dispute. Disputes over contractual requirements commonly arise in the midst of the undertaking, rather than at its outset or conclusion. The cost of interruption is then at its highest; the risk of consequential harms (which must ultimately be borne by one party or the other) leverages the stakes beyond the amount initially in dispute. If the party on whom a questionable demand is made can protect its position only by refusing performance, the costs of resolution are magnified accordingly. Performance with reservation of rights can reduce these costs by deferring dispute resolution to a point at which the risk of consequential harm is lower.[20]

Provisional performance is the rule for transactions governed by the Uniform Commercial Code, which provides that "[a] party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights re-

yard v. Curtis Prods., Inc., 251 La. 624, 205 So.2d 422 (1968).

**19.** *Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex.2006); *Gevinson v. Manhattan Constr. Co. of Okla.*, 449 S.W.2d 458, 465 n. 2 (Tex.1969); *Milner v. Schaefer,*

211 S.W.2d 600, 603 (Tex.Civ.App.-San Antonio 1948, writ ref'd); *Tempel v. Dodge*, 89 Tex. 69, 33 S.W. 222, 222 (1895).

**20.** RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35 cmt. a (Tentative Draft No. 3, 2004).

served." [21] The UCC imposes no requirement that the other party consent to the reservation for it to be effective.

The point of reserving rights is, of course, is to see them vindicated, which cannot be accomplished without a remedy.[22] The remedy, according to the *Restatement (Third)of Restitution and Unjust Enrichment,* is restitution. The UCC provision, the Restatement explains, "presume[s] . . . that the 'rights reserved' by a performing party—'where one party is claiming as of right something which the other believes to be unwarranted'—take the form of a claim in restitution for the value of any benefit conferred to which the recipient was not entitled." [23] Texas law recognizes restitution as a remedy for unjust enrichment "[w]hen a person has obtained a benefit by taking undue advantage of another".[24] The *Restatement* sets out the following rule, originally suggested by Professor Mark Gergen: [25]

§ 35. Performance of Disputed Obligation

(1) If one party to a contract demands from the other a performance that is not in fact due by the terms of their agreement, the party on whom the demand is made may render such performance under protest or with reservation of rights, preserving a claim in restitution to recover the value of the benefit conferred in excess of the recipient's contractual entitlement.

(2) The claim described in subsection (1) is available only to a party acting in good faith and in the reasonable protection of the claimant's own interests. It is not available where there has been an accord and satisfaction between the parties, or where a performance with reservation of rights is inadequate to discharge the claimant's obligation to the recipient.[26]

The rule restricts restitution to claimants who act in good faith and in the reasonable protection of their own interests. The provisional performance must also go far enough to discharge a claimant's obligation. In such circumstances, restitution is not precluded by the voluntary-payment rule because, as comment b to section 35 explains, the claimant acts under a kind of

---

**21.** Tex. Bus. & Com.Code §§ 1.102 ("Scope of Chapter" in Uniform Commercial Code); 1.308(a) ("Performance or Acceptance Under Reservation of Rights").

**22.** *See Miers v. Brouse,* 153 Tex. 511, 271 S.W.2d 419, 421 (1954) ("The first maxim of equity is that it will not suffer a right to be without a remedy. As Lord Holt early said: 'If the plaintiff has a right, he must of necessity have a means to vindicate and maintain it. . . . It is a vain thing to imagine a right without a remedy.' " (citation omitted)); *Ashby v. White,* 92 Eng. Rep. 126, 136 (K.B.1703) (Lord Holt, C.J., dissenting), *reprinted in* 1 SMITH'S LEADING CASES 464, 483 (9th ed. 1889). On writ of error from the King's Bench, the House of Lords reversed the judgment and ruled in favor of the plaintiff for the reasoning stated in Lord Chief Justice Holt's dissent. 1 Eng. Rep. 417 (H.L.1703); *see* 90 Eng. Rep. 1188 (H.L.1703); JOHN WILLIAM SMITH ET AL., A SELECTION OF LEADING CASES ON VARIOUS BRANCHES OF THE LAW: WITH NOTES 509 (9th ed., Charles H. Edson & Co. 1888).

**23.** RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35 cmt. a (Tentative Draft No. 3, 2004).

**24.** *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992) ("A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.").

**25.** *See* Gergen, *supra* note 3, at 728.

**26.** RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35 (Tentative Draft No. 3, 2004); *id.* cmt. a ("The rule of this Section is implicit in the negative statement of U.C.C. § 1–308(a). . . .").

coercion—the pressure to take action to avoid consequential harms before uncertainty as to contractual obligations can be resolved.[27]

Section 35 restates the principle of restitution inherent in the UCC provision and applicable to contracts generally. But insurance policies are not governed by the UCC, and as comment c to section 35 recognizes, "disputes between insurers and policyholders over the insurer's duty to pay a claim, or to settle or defend a claim brought against the policyholder, present special difficulties for the law of restitution, because the insurer's duty to indemnify and defend is subject to extensive regulation under local insurance law."[28] Regulation is necessary because an insured is typically at a distinct disadvantage in dealing with an insurer, having little or nothing to say about the policy language, little or no experience in evaluating coverage issues, and neither the wherewithal nor the inclination to litigate disputes. The prospect that a third-party liability claim may not be covered by insurance poses a significant threat to most insureds. As the *Restatement* observes, "[p]ublic policy strongly favors the prompt discharge of an insurer's obligations to its policyholder."[29]

Nevertheless, Texas law permits a liability insurer to defend or settle a claim against its insured while reserving its rights to contest coverage,[30] as long as it acts timely and in good faith.[31] An insured may reject the reservation, demand an unconditional defense, and sue for contractual and extracontractual damages.[32] But if the insured does not reject the reservation, the insurer must be given a meaningful opportunity to resolve the coverage dispute if the reservation is to be anything but an empty formality. Without that opportunity, the *Restatement* explains:

> the risk of enhanced liability in coverage disputes may compel a performance by the insurer that is outside the scope of the insurance contract. If the insurer,

---

**27.** RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35 cmt. b (Tentative Draft No. 3, 2004) ("When the cost of resistance includes a risk of further loss or liability, beyond the amount already in controversy, the party on whom the demand is made may have no practical alternative but to submit. Performance in such cases is not 'voluntary,' and restitution is uniformly available to rectify the overperformance that the claimant has effectively been compelled to render."); *see Dallas County Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 886 (Tex.2005); *BMG Direct Mktg. v. Peake*, 178 S.W.3d 763, 776–778 (Tex.2005).

**28.** *Id.* cmt. c.

**29.** *Id.*

**30.** *See American Physicians Ins. Exch.*, 876 S.W.2d at 861 (Hightower, J., dissenting).

**31.** *See American Eagle Ins. Co. v. Nettleton*, 932 S.W.2d 169, 174 (Tex.App.-El Paso 1996, writ denied) ("[A]n insurer may undertake the insured's defense and later deny coverage if it 'reserves its rights' by advising the insured that it may interpose a policy defense following adjudication of the claimant's suit against the insured. This is a proper course of action only when the insurer has a good faith belief that the complaint alleges conduct which may not be covered by the policy. In such a situation, the reservation of rights will not breach the duty to defend if timely notice of intent to reserve rights is sufficient to inform the insured of the insurer's position." (citations omitted)).

**32.** *Texas Ass'n of Counties County Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 141 (Tex.2000) (Owen, J., joined by Hecht, J., dissenting) ("Under Texas law, if an insurance company tenders a defense with a reservation of rights, the insured may either accept that defense with the reservation of rights, or it may refuse the tendered defense and defend the suit itself. If the insured decides to defend itself, it must bear the cost of that defense if the claims against it are not covered by insurance." (citation omitted)).

by denying coverage, risks a potential liability greater than the amount initially in controversy—and if the insurer is obliged to take action before the coverage issue can be adjudicated—the effect of the applicable legal rules may be to subject the insurer to an extracontractual liability. Such a result distorts the parties' allocation of risks and creates the sort of unjust enrichment with which the present Section is concerned.[33]

The present case is a prime example of such distortion of risk and unjust enrichment when an insurer is denied restitution from its insured for settling non-covered claims. The Excess Underwriters' *Stowers* obligation was to accept a reasonable settlement offer within policy limits or stand to the full recovery against Frank's Casing, even beyond policy limits. Once ARCO made such an offer, Frank's Casing had almost no incentive to confront the coverage issues. If ARCO's claims were covered by the Excess Underwriters' policy, Frank's Casing had no exposure, and if the claims were not covered, so what? If the Excess Underwriters settled and won the coverage dispute, Frank's Casing had nothing to lose without an obligation to reimburse the settlement of the non-covered claims. And if the Excess Underwriters did not settle and lost the coverage dispute, Frank's Casing would have no obligation. Only if the Excess Underwriters refused to settle and later won the coverage dispute would Frank's Casing risk any liability. But while Frank's Casing's risk of refusing to contribute to the settlement was slight, the Excess Underwriters' risk of refusing to settle was enormous. Even if they won the coverage dispute, they could not recover without a right of reimbursement, and if they lost the coverage dispute, their *Stowers* liability would extend to ARCO's full recovery, perhaps $16 million. Having estimated their ultimate exposure to be $5 million, as reflected in their settlement offer to Frank's Casing, the Excess Underwriters barely hesitated in paying $2 million more to settle $16 million in claims, especially after trial had begun and Frank's Casing itself viewed ARCO's case claims as strong.

If the Excess Underwriters' assessment of the coverage issues had been correct, they would have paid $2 million more than they owed. As it turned out, the Excess Underwriters were finally determined to have no obligation at all. None of ARCO's claims were covered. *Stowers* liability combined with no right of reimbursement effectively forced the Excess Underwriters to extend Frank's Casing $7 million in coverage for which it had not contracted and had paid nothing. Such disincentive for insurers to resolve coverage issues carries a cost that must be paid in higher premiums.

The purpose of the law of restitution is to prevent such unjust enrichment without permitting abuse. In *Matagorda County*, the Court noted that an insurer's right of reimbursement could operate unfairly against an insured. Though the Court did not elaborate, such a situation can occur when the plaintiff's claims exceed the defendant's assets, but not its policy limits, coverage is uncertain, and the insurer can settle over the defendant's objection.[34] But

---

**33.** RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35 cmt. c (Tentative Draft No. 3, 2004).

**34.** Suppose the following: at trial, P has a 50% probability of recovering 10 and a 50% probability of recovering 0; coverage is 50/50; policy limits are 10; and D has 2 in assets.

P expects, on average, to recover 3. Half the time P loses at trial and takes nothing. A fourth of the time he wins at trial and there is coverage, so he recovers 10 from I. But an-

*Matagorda County* incorrectly asserted that a right of reimbursement might result in a defendant having to pay more than it is worth.[35] It is impossible for an insurer to exact more from an insured than he is worth; you can't squeeze blood from a turnip. And an insurer has no more incentive or ability to sue for reimbursement that cannot be collected than a plaintiff has to demand a settlement that cannot be paid. Indeed, it almost always has less incentive. Not only will the insurer want to leverage the coverage dispute to extract a lower settlement demand from the plaintiff, but an insurer who pursues its insured into bankruptcy does so at a business cost paid in bad customer relations and lower premiums.

In any event, Frank's Casing does not argue that an obligation to reimburse the Excess Underwriters would have put it in the predicament hypothesized in *Matagorda County*. Frank's Casing is a substantial business, and there is nothing to indicate that it lacked the means to meet its liability to ARCO. When both the defendant's assets and the plaintiff's demand exceed the insurer's policy limits, granting the defendant the unilateral power to accept or reject a settlement offer may unfairly prejudice the insurer.[36]

The *possibility* of prejudice to an insured, not *actually* present in either this case or in *Matagorda County*, is avoided under section 35, which would not allow reimbursement because the insurer's settlement of the claim under a reservation of rights would result in a higher payment by the insured and therefore be "inadequate to discharge [the insurer's] obligation to the [insured]". The remedy for unjust enrichment does not come at a price of unfairness to the other party. Further, if the restrictions on restitution contained in section 35 were inadequate to prevent an unjust application of the rule, equity could intervene because restitution is an equitable remedy.[37] If an insured were unfairly

---

other fourth of the time he wins at trial but there is no coverage, so he is limited to D's assets, 2. With one chance at 10, one at 2, and two at 0, he should expect 3.

With no right of reimbursement, I expects at trial to pay only 2.5 on average, since there is only one chance in 4 that it will owe 10, and D expects to pay only 0.5 on average, since there is only one chance in 4 that it will owe 2. If there is a right of reimbursement, I can pay P 3 to settle and still lower its expected cost to 2 on average, since half the time it will recover nothing from D in the coverage suit and the other half it will recover D's 2. But D's expected cost then increases, on average, to 1, since it will lose the coverage fight half the time. In this situation, if I can insist on settling for 3, it benefits itself and harms D.

**35.** 52 S.W.3d at 135 (stating that a right of reimbursement might force an insured to "choose between rejecting a settlement within policy limits or accepting a possible financial obligation to pay an amount that may be beyond its means, at a time when the insured is most vulnerable.").

**36.** Now suppose: at trial, P has a 50% probability of recovering 20 and a 50% probability of recovering 0; coverage is 50/50; policy limits are 10; and D has 50 in assets.

At trial, P expects, on average, to recover 10. D expects, on average, to pay 7.5. I expects, on average, to pay 2.5. If D has the unilateral power to accept or reject settlements, even assuming I has a right of reimbursement, I's average expected cost is increased to 5, and D's falls to 5. But if D can use the threat of *Stowers* liability to force I to pay 10, and I has no right of reimbursement, I's average expected cost is increased to 10, and D's falls to 0.

**37.** *BMG Direct Mktg. v. Peake*, 178 S.W.3d 763, 771, 775 (Tex.2005) (noting, however, that "an adequate legal remedy may render equitable claims of unjust enrichment and equitable defenses of voluntary-payment unavailable" and citing *Matagorda County*, 52 S.W.3d 128, 133–135 (Tex.2000)); *Dallas County Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 886 (Tex.2005) (Brister, J., joined by Jefferson, C.J, and O'Neill, J., dissenting to

prejudiced by affording an insurer a right of reimbursement, the answer is to limit the right in that situation to prevent the prejudice, not to deny it altogether in the many other cases in which it is necessary to prevent unjust enrichment.

The Court rejects section 35, not because it is in any way unfair to insureds, but because it "undermine [s] ... the predictability that our decision in *Matagorda County* provided".[38] Of course, it does. *Never* is extremely predictable. But section 35 would certainly create no serious unpredictability in this case or any one like it. It is not very hard to see that Frank's Casing should not be given the benefit of coverage it did not buy.

Frank's Casing and amici curiae have raised several other arguments against an insured's right to be reimbursed by its insured for settling non-covered claims.

1. *Such a right disincentivizes insurers to obtain a resolution of coverage issues before a liability claim must be settled.* We have encouraged prompt resolution of coverage issues through declaratory judgment actions.[39] The argument that an insurer entitled to reimbursement might delay such resolution is easily answered; an insurer who intentionally delays resolution of coverage issues to prejudice the insured may, in a particular case, forfeit the right of reimbursement by failing to act in the good faith required by section 35.

Denying reimbursement altogether raises a different set of problems. Early resolution of coverage issues is often impossible or imprudent.[40] In many cases, there is simply not time. Here, for example, while Frank's Casing faults the Excess Underwriters for doing nothing to resolve coverage issues in the eleven months that the liability case was pending against it, the fact that the coverage case took nearly three years and seven motions for summary judgment strongly suggests that it could not have been completed before the trial of ARCO's claims. In other cases, litigating coverage while the liability claim is pending is prejudicial to the insured. The insured may be forced to take positions in support of coverage that undermine the defense of the liability claim. Pitting the insurer and insured against one another may create intolerable conflict at a time when their interests in defending against liability should be aligned. It may simply be distracting and difficult for the insured to fight the liability claimant on one front and his insurer on another. These problems may now be unavoidable, since the Court's refusal to allow an insurer to recover payment of a non-covered claim means that unless an insured agrees

---

opinion holding that allegedly illegal student activity fees were voluntarily paid as a matter of law). *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1, cmt. b ("This equitable conception of the law of restitution is crystallized by Lord Mansfield's famous statement in *Moses v. Macferlan* (1761): 'In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.' Explaining restitution as the embodiment of natural justice and equity gives the subject an undoubted versatility, an adaptability to new situations, and—in the eyes of many observers—a particular moral attrac-

tiveness. Restitution in this view is the one aspect of our legal system that makes a direct appeal to standards of equitable and conscientious behavior as a source of obligations that society will enforce with a legal sanction.").

**38.** *Ante* at 58.

**39.** *See, e.g., Farmers Tex. County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 84 (Tex.1997) (per curiam); *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 714 (Tex.1996).

**40.** *Griffin,* 955 S.W.2d at 84.

to defer coverage issues, they must be determined before the liability claim is resolved or be forever lost. It may even be necessary to delay resolution of the liability claim. The Court certainly does not suggest that an insurer should be denied a fair opportunity to litigate coverage issues.

2. *If there is to be such a right, it should be expressed in the policy.* It is well settled that the law may imply contractual terms to prevent unjust enrichment. In *Ferrous Products Co. v. Gulf States Trading Co.,* we said, quoting hornbook law:

> A quasi contractual obligation is one that is created by the law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent.

> \* \* \*

> Contracts implied in law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu.... Such contracts rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do.[41]

This settled law is a part of every contract and governs the transaction.[42] The argu-

ment here is that the general law of restitution should not apply. But restitution is necessary if an insurer's reservation of rights, long allowed by Texas law, is to have any viability in cases in which coverage issues cannot be resolved before the liability claim. To deny restitution in such cases, given an insurer's *Stowers* duty to accept a reasonable settlement of a liability claim within policy limits, is effectively to create coverage where none exists. That is what happened in this case.

3. *An express agreement—the policy—precludes an agreement implied in law.* This both misstates the law and misapplies it to this case. It is true, as we said in *Fortune Production Co. v. Conoco, Inc.,* that

> [g]enerally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory.... That is because parties should be bound by their express agreements. When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement.[43]

But we also specifically noted that there were certain exceptions which would allow recovery of "overpayments under a contract ... under a theory of restitution or unjust enrichment."[44] Moreover, the Excess Underwriters' policy does not cover the subject of restitution. It required that Frank's Casing make a claim within a year

---

**41.** 160 Tex. 399, 332 S.W.2d 310, 312 (1960) (citations omitted).

**42.** *See, e.g., Wessely Energy Corp. v. Jennings,* 736 S.W.2d 624, 626 (Tex.1987) ("The laws existing at the time a contract is made becomes a part of the contract and governs the transaction. *Langever v. Miller,* 124 Tex. 80, 76 S.W.2d 1025, 1026–27 (1934).").

**43.** 52 S.W.3d 671, 684 (Tex.2000) (citations omitted).

**44.** *Id.* (citing *Southwestern Elec. Power Co. v. Burlington N. R.R. Co.,* 966 S.W.2d 467, 469 (Tex.1998) ("[I]n some circumstances, overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment.")).

after its liability became fixed[45] and then allowed the Excess Underwriters thirty days to decide whether to pay it. But this provision neither required nor entitled the Excess Underwriters to defer a decision on a claim until after Frank's Casing had settled it and thus force a *Stowers* violation. The policy merely provided an outside time frame for making and paying claims. On the subject of reimbursement in the circumstances before us the policy was entirely silent, and that silence does not preclude restitution.

4. *The risk of any uncertainty about coverage should be borne entirely by the insurer because of its control of the liability litigation and its superior knowledge and experience with coverage issues.* There is no question that most insurers are better able to assess coverage issues than most insureds, since insurers are likely to have encountered the issues many times. But as this case illustrates, an insurer must be virtually certain that coverage does not exist before it can justify the risk of refusing to settle a claim within policy limits. Few cases are so clear. As the *Restatement* recognizes, restitution is an equitable accommodation of the insurer's and insured's interests in reserving and later resolving coverage issues. Also, while it may be possible for an insurer to exercise its right to control the defense and settlement of a liability claim in a way that unfairly prejudices an insured sued for restitution, the prejudice can be addressed in any case in which it occurs without denying restitution in all cases. Frank's Casing makes no claim of such prejudice in this case.

5. *Insurers will use meritless coverage issues and the threat of a suit for reimbursement to force insureds to contribute to settling claims when they should not have to.* This is not what happened in the present case. Instead, Frank's Casing repeatedly refused to contribute anything to the settlement of ARCO's claims, either settling the coverage issues at the same time or reserving resolution for later, when the umbrella policy provided no coverage at all. The law does not punish insureds for such obduracy as it would insurers, as for example with Stowers liability. But an insured should not be rewarded for forcing coverage when none exists. An insurer who raises bogus coverage issues to extract a settlement contribution from an insured is subject to other sanctions as for any unfair practice.[46]

6. *Defense counsel cannot advise an insured that a settlement offer is reasonable if in so doing he subjects the insured to a reimbursement obligation.* The premise is incorrect. Counsel's advice regarding the reasonableness of an offer does not trigger the insurer's claim for restitution. That claim depends entirely on the effectiveness of the reservation of rights, the resolution of coverage issues, the reasonableness in fact of the acceptance of the settlement offer, and the insurer's good faith and absence of inequitable conduct. Of course, if counsel's advice is communicated beyond persons protected by the attorney-client privilege, it may be evidence of the reasonableness of the offer when the issue arises, but if kept confidential the advice would be privileged from disclosure. A right of restitution does not pose a conflict for defense counsel in advising the insured. In this case, there is no hint of such a conflict. We have no indication what Frank's Casing's defense counsel thought of ARCO's settlement offer, and corporate counsel did not hesitate in pronouncing the offer reasonable and twice

---

45. *See supra* note 6.

46. *See* TEX. INS. CODE § 541.060 (prohibiting certain unfair settlement practices).

insisting that the Excess Underwriters accept it.

7. *If an insurer's settlement of a noncovered claim can be recovered from the insured, the insurer will settle early, even if unfavorably, to minimize defense expenses and avoid* Stowers *liability.* It is difficult to imagine why an insurer would accept a settlement offer that is unreasonable and to which its insured objects, and then try to seek reimbursement from the insured. If for some reason it occurred, it would exhibit the lack of good faith that section 35 requires.

These arguments do not support making an exception to the general law of restitution for the defense and settlement of liability insurance claims. The Court cites only one other court of last resort that has considered the issue: *Blue Ridge Insurance Co. v. Jacobsen.* There, the Supreme Court of California allowed a right of reimbursement in circumstances similar to this case.[47] I agree with the reasoning of that case, as does the *Restatement.*[48]

\*　　\*　　\*　　\*　　\*　　\*

I would reverse the court of appeals' judgment and remand the case to the trial court for rendition of judgment in favor of the Excess Underwriters. Accordingly, I respectfully dissent.

Justice WAINWRIGHT, dissenting.

In the heat of trial, an insured and its excess insurer reached an agreement to address a situation not covered by the insurance policy. The insured accepted a $7.5 million payment from the insurers (including $500,000 from the primary insurance carrier) to settle the case against it, but later objected to enforcement of an express condition in the agreement to settle the case on its behalf. A deal is a deal, whether the insurer or the insured likes it after the fact. Because the Court's holding contradicts this principle, I respectfully dissent.

At trial it quickly became clear that defendant Frank's Casing was the focus of plaintiff ARCO's attention. Frank's Casing and its insurers feared a large verdict that might eclipse the limits of its excess coverage. On two prior occasions Frank's Casing refused offers by the excess underwriters to fund a settlement of the claims brought against it by ARCO, subject to the condition that the excess underwriters could seek a reimbursement if the settled claims were not covered. The third offer to settle the dispute with ARCO for $7.5 million in insurance funds was also expressly conditioned on the right of the excess underwriters to seek reimbursement of the settlement payment if a later declaratory judgment action determined that ARCO's claims were not covered by the excess policy. Frank's Casing did not respond verbally or in writing to the third offer, but Frank's Casing accepted the $7.5 million check and announced on the record in the trial court that it accepted the insurance payment to fund the settlement of the dispute and that the settlement with plaintiffs was consummated "by letter dated February 23, 1998." The February 23rd letter contained the reimbursement term. The trial court rendered judgment on the settlement. In the subsequent declaratory action brought by the excess underwriters, Frank's Casing lost its argument that ARCO's claims were covered by the excess policy on summary judgment and did not appeal the final judgment. Having se-

---

**47.** 25 Cal.4th 489, 106 Cal.Rptr.2d 535, 22 P.3d 313, 318–319 (2001).

**48.** RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35, illus. 10 & reporter's note (Tentative Draft No. 3, 2004).

cured millions of dollars from the excess underwriters by virtue of their offer to settle the dispute, Frank's Casing now claims that it is not bound by the express condition in the offer to reimburse the payment by the excess underwriters. By its actions and its statements in the trial court confirming the settlement, Frank's Casing accepted the February 23rd offer. And Frank's Casing lost on the issue the parties reserved to finally determine whether a right of reimbursement arose— the trial court determined there was no insurance coverage for ARCO's claims.

Frank's Casing admits that the excess underwriters paid $7 million to settle the claims on its behalf. Frank's Casing does not dispute that the third settlement offer conditioned the right to reimbursement on whether coverage was found to exist and did not reject the offer or object to the reimbursement condition. Frank's Casing lost on the coverage issue. Notwithstanding these facts, the Court surprisingly bifurcates the settlement offer to allow Frank's Casing to accept the benefits of a contract and reject its obligations. The Court holds that Frank's Casing consented to the settlement payment but not to the express condition. Frank's Casing, the Court holds, can keep the $7.5 million benefit from the agreement but is not bound by the obligation to reimburse the excess underwriters when it lost its claim that there was coverage of the settled claims. The Court essentially decides that the insurer is bound by the deal but that the insured can rewrite the deal if it does not like the result.

The Court relies on *Texas Association of Counties County Government Risk Management Pool v. Matagorda County*, 52 S.W.3d 128 (Tex.2000). In *Matagorda County*, the Court restricted an insurer's right to reimbursement of settlement payments later found not to be covered by an insurance policy to circumstances where the insurer "obtains the insured's clear and unequivocal consent to the settlement and the insurer's right to seek reimbursement." *Id.* at 135. *Matagorda County* erected this uncommon standard for contract formation even though the standard eschewed traditional common law contract principles on the tenets necessary to establish a right to recover.

## I.

Once upon a time, the relationship between insurer and insured was fully one of contract and was governed by the terms and conditions of the policy. *See Progressive County Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex.2003) (insurance policy is a contract to be interpreted according to contract principles); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987) ("It is a fundamental rule of law that insurance policies are contracts and as such are controlled by rules of construction which are applicable to contracts generally."). Even after common law modifications and legislative regulation of the parties' consensual relationship, *see, e.g.*, TEX. BUS. & COM. CODE §§ 17.41–.63; TEX. INS. CODE §§ 541.001–.454; *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987) (holding that insurers owe a duty of good faith and fair dealing toward insureds); *G.A. Stowers Furniture Co. v. Am. Indemn. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App.1929, holding approved) (creating a duty to accept reasonable settlement demands within policy limits), the relationship between insurer and insured is still fundamentally based on the agreement of the parties. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex.2003) (insurance policies are interpreted under rules of contract construction); *Barnett*, 723 S.W.2d at 665. In an insurance arrangement like the one at issue, the in-

sured and insurer enter an agreement for the insurer to cover prescribed risks. Generally, the insured pays premiums to protect it against certain unrealized fortuitous costs or damages, up to an agreed limit, that it may suffer or be obligated to pay. *See* ERIC MILLS HOLMES, ET AL., HOLMES' APPLEMAN ON INSURANCE, § 1.4, at 22–23 (2d ed.1996). A contract of insurance obligates the insurer to cover only the risks prescribed in the policy. *Id.* at 29.

The standard of proof for an agreement is straightforward. A contract is established when proven by a preponderance of the evidence that an offer is accepted, accompanied by consideration. *See Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex.1997) ("A contract must be based upon a valid consideration, in other words, mutuality of obligation."); *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972) ("[T]here must be shown the element of mutual agreement which, in the case of an implied contract, is inferred from the circumstances."). Unusual to Texas's common law of contracts, *Matagorda County* made the existence of a contractual agreement in this context subject to "clear and unequivocal" proof of acceptance.[1] *Matagorda County*, 52 S.W.3d at 135. *Matagorda County* provides no reasoning to support its creation of that particular standard, but that remains the law in Texas. Because the parties reached an agreement on reimbursement, we should decide this case by simply enforcing their agreement.

## II.

Frank's Casing agreed to pay premiums for the provision of excess insurance coverage by the excess underwriters in the amount of $10 million. ARCO sued Frank's Casing and others after an offshore drilling platform partially fabricated by Frank's Casing for ARCO collapsed in the Gulf of Mexico. The excess underwriters issued a reservation of rights letter contesting coverage under its excess insurance policy with Frank's Casing. When settlement discussions were unfruitful, the case was tried to a jury. During the heat of trial, with a large verdict appearing increasingly likely, Frank's Casing entered another round of settlement discussions directly with ARCO and procured a settlement demand of $7.5 million, which Frank's Casing presented to the excess underwriters. The excess underwriters agreed to pay $7 million (plus $500,000 from the primary insurer) to settle the case, conditioned on their right to seek reimbursement if they were ultimately not required to extend coverage for the claims at issue.

At the time the parties were considering the settlement, both believed they were in difficult positions. The record indicates that both parties believed a substantial verdict, possibly beyond the excess layer of insurance coverage, was likely. Both also knew that their original contract of insurance did not address the issue of the insurer's ability to obtain reimbursement of a settlement payment for uninsured claims. Under these circumstances, the following decision trees grew.

During the trial, the excess underwriters had to decide whether to fund a settlement for an amount less than their policy limits, which included claims potentially

---

1. The Court has not defined the *Matagorda County* "clear and unequivocal" standard for entering an agreement for reimbursement. It seems to require more than a simple preponderance of the evidence; beyond that, we do not know what this standard requires. Even evidence supporting a clear and convincing standard may be equivocal, but *Matagorda County* requires more than that.

not covered by their policy, to avoid the risk of a larger judgment. By agreeing to pay a settlement amount that was less than the excess underwriters' policy limits, the excess underwriters would avoid a verdict that could exhaust their policy limits and potential extra-contractual claims. Thus, the excess underwriters would benefit from the proposed settlement.

Frank's Casing likewise believed that it was faced with the specter of a large jury verdict against it. By settling within the excess underwriters' policy limits, Frank's Casing avoided a verdict beyond policy limits, a portion of which Frank's Casing would be personally liable to pay. The settlement would end the trial and vanquish the risk of a large verdict and Frank's Casing's potential exposure for amounts above the excess limits or for the entire verdict if there were no coverage. In other words, the settlement would also benefit Frank's Casing.

The excess underwriters decided to pay their portion of the settlement but conditioned their payment on their right to seek reimbursement if the claims were proven not to be a risk the parties had agreed to cover under the excess policy. The excess underwriters sent a letter on February 23, 1998, making this offer to Frank's Casing. The letter further stated that the excess underwriters "w[ould] contact Arco/Vastar's attorney th[at] morning" to settle the claims against Frank's Casing. Frank's Casing concurred that the settlement was reasonable and not only approved but demanded that the excess underwriters consummate the $7.5 million settlement. The excess underwriters sent a second letter on February 23rd to confirm the settlement with ARCO, copied Frank's Casing on the letter, and then filed a declaratory judgment action contesting coverage that same day. The next day at the hearing before the trial court, which had recessed

trial to give the parties the opportunity to resolve the dispute, the parties dictated their settlement into the record. At the hearing, Frank's Casing did not object to any portion of the settlement, but asserted that by agreeing to the settlement the excess underwriters waived their right to contest "coverage," making no mention of reimbursement.

Hence, we come to the dispute before this Court. Did Frank's Casing obtain a windfall—i.e., payment by its insurer of millions of dollars to settle claims against it for which there was no coverage? Or did the excess underwriters voluntarily pay a settlement to obtain the benefits of saving potentially millions of dollars from the expected verdict? Two sophisticated entities carefully exercised their rights and obligations in light of their potential exposure. Both made reasoned decisions they believed to be in their best interests under the circumstances. But for the reimbursement condition included in the excess underwriters' offer accepted by Frank's Casing, I would conclude that there is no right to reimbursement. Absent the parties entering into a legally enforceable agreement, I do not believe that the equities of the parties' respective circumstances alone support allowing a right to recoup the settlement payment.

If Frank's Casing's only conduct toward the excess underwriters upon obtaining the $7.5 million settlement offer from ARCO was to acquiesce to a settlement that did not include the reimbursement condition, the excess underwriters would have no right to reimbursement. However, I conclude that Frank's Casing, by its acceptance of the $7.5 million payment and acquiescence in the settlement, bound itself under principles of contract law to the condition that the excess underwriters would be able to seek reimbursement. Frank's Casing was not simply a beneficia-

ry of its insurer's settlement, but demanded in a prior letter dated February 19, 1998, that the excess underwriters act in a "reasonably prudent" manner, accept the settlement offer from ARCO, and do so "BEFORE a ruling by the court on the contract issues ... [which] could occur at any time, but will occur, at the latest, by beginning of court Tuesday of next week." Including the weekend, the following Tuesday, February 24, 1998, was five days away. The excess underwriters agreed to pay the settlement conditionally. The second February 23rd letter, *which Frank's Casing told the trial court was the basis of settlement*, provided:

> [The excess underwriters] continue to reserve all rights against Frank's [Casing] as to coverage under the Umbrella Policy, and *will hold Frank's [Casing] responsible for and will seek reimbursement of all sums paid in settlement of claims for which no coverage exists under the Umbrella Policy.*

(emphasis added). The excess underwriters then settled the case against Frank's Casing the same day and faxed written confirmation to ARCO with a copy to Frank's Casing. Frank's Casing never asserts that it rejected the settlement offer or made a counteroffer. Instead, Frank's Casing acknowledges that it accepted the settlement offer from the excess underwriters but argues that the excess underwriters did not obtain "Frank's [Casing's] agreement nor its clear and unequivocal consent to seek reimbursement." [2]

The second letter sent on February 23rd to the plaintiffs confirmed the verbal settlement but stated that the excess underwriters would *continue to reserve all rights*

"against Frank's [Casing] as to coverage" and, for a second time that day, affirmed that they would "hold Frank's [Casing] responsible for and will seek reimbursement of all sums paid in settlement of claims for which no coverage exists under the Umbrella policy." Frank's Casing again did not reject but accepted the settlement. After entering the settlement, the excess underwriters filed a declaratory judgment action contesting coverage that afternoon.

The next morning the trial court recessed the trial to enable the parties to dictate their settlement into the record. Frank's Casing stated that "by letter dated February 23, 1998" (which conditioned settlement on reimbursement) from the excess underwriters to the plaintiffs, it had agreed to pay $7.5 million to settle the case with the plaintiffs. Frank's Casing then asserted that the excess "underwriters have either waived their right to reserve cover [sic] issues or alternatively [are estopped] from asserting any coverage issues since underwriters have agreed to the settlement." Counsel for the excess underwriters reconfirmed on the trial court record:

> This settlement is being funded by Frank's [Casing's] umbrella underwriters subject to a full reservation of all rights against Frank's [Casing] under the umbrella policy.... And these [excess] underwriters will hold Frank's [Casing] responsible for and will seek reimbursements of all sums paid [for] the settlement of claims for which no coverage exists under the umbrella policy.

2. Frank's Casing also complains that it had only a few hours to study the proposed settlement from the excess underwriters. This complaint rings hollow as it was Frank's Casing's February 19th letter that imposed the February 23rd deadline on the excess underwriters to settle the case, and Frank's Casing threatened to pursue extra-contractual claims if the deadline was not met.

The trial court rendered judgment on the agreement dictated into the record. The Settlement Agreement and Release, signed later by Frank's Casing and the excess underwriters, confirmed that the excess underwriters' right to seek reimbursement was not released. The covenants not to sue and the releases between the parties did not apply "to any claims that exist presently ... between Defendant Frank's [Casing] and Frank's [Casing's] Insurers arising from the claims asserted by Plaintiffs."

Frank's Casing has never disputed that the excess underwriters' settlement offer was conditioned on a right to seek reimbursement. Frank's Casing argues that by its actions it accepted the part of the settlement offer providing for the excess underwriters to make a $7 million settlement payment but did not accept the condition on that promise. The facts do not support Frank's Casing's position.

### III.

A contracting party cannot accept the benefits of a contract and disclaim its obligations. *W.H. Putegnat Co. v. Fid. & Deposit Co. of Md.,* 29 S.W.2d 1004, 1006 (Tex.Comm'n App.1930) ("Where one accepts the benefits of a contract[,] he must assume its burdens."); *United Concrete Pipe Corp. v. Spin–Line Co.,* 430 S.W.2d 360, 364 (Tex.1968) (noting that a party may have the right to withdraw his consent before a contract's performance but not after the promise is accepted or performed); Robert H. Jerry, II, *The Insurer's Right to Reimbursement of Defense Costs,* 42 ARIZ. L. REV. 13, 72 (2000) ("[A]cquiescence in and acceptance of the benefits of [the party's] performance constitute a manifestation of acceptance of the terms on which [the party's] performance was tendered."). To effectively decline an offer, some terms of which an offeree disapproves, the offeree must reject the offer or make a counteroffer. *See Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.,* 661 S.W.2d 933, 934–35 (Tex.1983) (determining that an additional term in a loan commitment was a counteroffer); *Komet v. Graves,* 40 S.W.3d 596, 601 (Tex.App.-San Antonio 2001, no pet.) (holding an attempt to change an offer before acceptance operates as a rejection and counteroffer). Neither occurred here before the settlement was consummated.

Frank's Casing accepted the settlement proposed by the excess underwriters, thereby acquiescing in the terms of the offer, and bound itself to the settlement under the law of contracts. *See Blue Ridge Ins. Co. v. Jacobsen,* 25 Cal.4th 489, 106 Cal.Rptr.2d 535, 22 P.3d 313, 317 (2001) (holding an insurer may seek reimbursement for settlement of uncovered claims where the insured is aware of the reservation but acquiesces). In practice in an insurance context, insureds often communicate acceptance of an offer by conduct, as in the case of an insured accepting a defense from an insurer that reserves its right to deny coverage. In such cases, the insured's acceptance of the defense is an implied consent to the insurer's reservation of the coverage issues, "even in the absence of an express consent or acceptance of the offer." *W. Cas. & Sur. Co. v. Newell Mfg. Co.,* 566 S.W.2d 74, 76 (Tex. Civ.App.-San Antonio 1978, writ ref'd n.r.e.); *see also In re Halliburton Co.,* 80 S.W.3d 566, 568 (Tex.2002) ("[W]hen an employer notifies an employee of changes to the at-will employment contract and the employee 'continues working with knowledge of the changes, he has accepted the changes as a matter of law.' ") (quoting *Hathaway v. Gen. Mills, Inc.,* 711 S.W.2d 227, 229 (Tex.1986)).

Although the excess policy does not address reimbursement, during the trial the

parties extended their contractual arrangement to address the risk of a large verdict by settlement and also agreed on a method to allocate the cost. The settlement vanquished the risk of a jury verdict against them. The allocation of the cost of settlement would be based on the outcome of the coverage suit. If the settled claims were found to be covered by the excess policy, the excess underwriters' payment of the settlement would end the matter. The contractual relationship would function as intended as the excess underwriters were paid premiums to protect Frank's Casing from covered risks within policy limits. If the settled claims were found not to be covered under the excess policy, the excess underwriters would have a contractual right to seek reimbursement of the settlement payment. The Court agrees that the parties reserved the coverage question but steadfastly ignores both the fact that Frank's Casing lost on the issue reserved (on which the parties hinged the excess underwriters' right to seek reimbursement) and the implications of that determination. By the terms of the parties' arrangement during trial, there arose a right to reimbursement.

The Court concludes that no such agreement was reached or can be implied in fact but nevertheless decides that Frank's Casing may keep the benefit of the offer to pay $7.5 million to settle the case but reject the reimbursement condition on the offer. As cited, *infra*, contract law does not allow the Court's approach of "having my cake and eating it, too." A deal is a deal, and in Texas we enforce deals. If Frank's Casing wanted to reject the condition on reimbursement, it should have rejected the $7.5 million payment on its behalf and proceeded with trial, made a counteroffer that excluded the condition on reimbursement, or objected to the condition on reimbursement before the settlement was entered. The Court posits that

"the excess underwriters' agreement to accept the settlement in light of Frank's Casing's reimbursement contest implied the insurers' consent to Frank's Casing's reservation of the reimbursement question." 246 S.W.3d 42, 48. The Court misstates some facts and ignores others. First, the excess underwriters did not accept the offer, Frank's Casing did; the excess underwriters made the offer. Second, as explained, it is true the parties hinged reimbursement on the answer to the coverage question. However, again, ignoring the facts, the Court refuses to acknowledge that Frank's Casing lost its claim of coverage, which gave rise to the excess underwriters' contractual right to reimbursement.

The Court asserts "it makes no more sense to say that Frank's Casing impliedly agreed to reimburse the carriers than it would to say that the carriers impliedly agreed to waive their coverage position." *Id.* at 58. The Court's logic falters as it again ignores material facts. The excess underwriters' reservation of the right to reimbursement is an express condition in the second February 23rd letter (pursuant to which the parties consummated the settlement) and acknowledged in the language of the subsequent settlement releases. It defies logic in this context to argue that the carriers impliedly waived positions they explicitly reserved in writing when the settlement was consummated, explicitly reserved during the hearing in the trial court, and then provided for in the settlement documents. The facts of Frank's Casing's agreement to the settlement are, however, very different. Frank's affirmed on the trial court record that it settled under the terms of the second February 23rd letter, affirmatively accepted the $7.5 million check, and raised no objection when counsel for the excess underwriters stated, in the same trial court hearing on

the record, that under the terms of the settlement they retained the right to seek reimbursement if the settled claims were later held not to be covered.

Frank's Casing also argues that recognizing the excess underwriters' contractual right to reimbursement is unfair. I do not agree. A trial court decided that the claims against Frank's Casing, which the excess underwriters agreed to pay to settle, were not covered claims under the excess policy. Frank's Casing did not appeal that determination, and it is therefore settled. Frank's Casing is not entitled to insurance coverage for risks for which it paid no premiums, and the excess underwriters are not obligated to pay for risks they did not agree to cover and for which they received no consideration. Should the parties have desired to cover such risks, they could have consented to such an arrangement by defining the scope of coverage to include the claims at issue and agreeing on premiums to be paid for such coverage. But they did not.

And neither would I create an equitable right to reimbursement in this case. *Matagorda County* left open a very small window for insurers to seek reimbursement of settlement payments for claims later determined to be outside policy coverage. The parties should sink or swim on the agreements they enter, unless the facts are such that they effect a change in the parties' agreement under traditional principles of contract law, are changed by the Legislature, or involve fraud, extortion, mutual mistake of fact, or another basis for altering a contract. Deciding this case based on a balancing of equitable rights to reimbursement would significantly widen this window but would invite insurers and insureds to unnecessarily introduce the uncertainty and unpredictability of restitutionary theories into these situations when the relationship is one based on contract.

## IV.

In conclusion, I would hold that absent an agreement that the insured reimburse the insurer for paying to settle a claim that is later held not to be covered, there is no right to reimbursement of the settlement payment. Such an agreement may be included in the insurance policy or by subsequent explicit consent or by conduct.

The parties' contractual relationship should govern an insurer's right to reimbursement. If our analysis of this reimbursement issue were based on the common law of contract, determined by the agreements between the parties, rather than undefined standards that are foreign to contract law, the law in this area would be less perplexing and more certain. Insureds and insurers alike benefit from predictability and certainty in the law.

